**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Raymond P. Moore**

Civil Action No. 18-cv-00909-RM-KLM

STEVEN L. HILL,

      Plaintiff,

v.

SGT. MYERS,
C.M. DENWALT, and
BRITTANY GOODWIN,

      Defendants.

---

## ORDER

---

      Plaintiff Steven Hill, an inmate at the Buena Vista Correctional Facility ("BVCF"), alleges after he reported that Defendant Myers inappropriately touched him, Defendants engaged in retaliatory and other conduct in violation of his rights under the First Amendment and Fourteenth Amendment. Defendants now move for summary judgment on both claims. Plaintiff filed a response and supplement, and Defendants filed a reply. Upon consideration of the motion, and being otherwise fully advised, the Court finds and orders as follows.

## I.      STANDARD OF REVIEW

      Summary judgment is appropriate only if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Henderson v. Inter-Chem Coal Co., Inc.*, 41 F.3d 567, 569–70 (10th Cir. 1994). Whether there is a genuine dispute as to a material fact depends upon

whether the evidence presents a sufficient disagreement to require submission to a jury or is so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986); *Stone v. Autoliv ASP, Inc.*, 210 F.3d 1132, 1136 (10th Cir. 2000); *Carey v. United States Postal Serv.*, 812 F.2d 621, 623 (10th Cir. 1987). Once the moving party meets its initial burden of demonstrating an absence of a genuine dispute of material fact, the burden then shifts to the nonmoving party to demonstrate the existence of a genuine dispute of material fact to be resolved at trial. *See 1-800-Contacts, Inc. v. Lens.com, Inc.*, 722 F.3d 1229, 1242 (10th Cir. 2013) (citation omitted). "'To defeat a motion for summary judgment, evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise.'" *Self v. Crum*, 439 F.3d 1227, 1230 (10th Cir. 2006) (quoting *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir.2004)).

"The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citation omitted). The facts, however, must be considered in the light most favorable to the nonmoving party. *Cillo v. City of Greenwood Vill.*, 739 F.3d 451, 461 (10th Cir. 2013) (citations omitted).

## II.    FACTUAL AND PROCEDURAL BACKGROUND[1]

Plaintiff was admitted to BVCF on April 4, 2017. Using a scoring system based on points, offenders can be classified at various levels; Plaintiff was already classified as a Close Custody offender before his arrival at BVCF. Close Custody is the highest scored classification

---

[1] The Court notes, in more than passing, that in some instances the parties have taken some liberties with what the record evidence supports.

custody level but the Colorado Department of Corrections ("CDOC") staff have discretion to override an offender's scored custody level. Although Plaintiff's score placed him in the Close Custody designation, on May 11, 2017, the BVCF classification committee did a discretionary override and placed him in medium custody.

Effective May 30, 2017, Plaintiff was assigned to work in the kitchen where, during the relevant time period, Defendant Myers was the kitchen supervisor. And all was apparently well, i.e., no reported incidents by or against Plaintiff, until September 3, 2017. Accordingly to Plaintiff,[2] on September 3 Defendant Myers inappropriately touched Plaintiff's lower back and buttocks (the "sexual misconduct" or "incident"). And, also that same day, Plaintiff asserts he orally reported the sexual misconduct to C.O.[3] Cisneros, an officer in the East Unit[4] where his cell was located, and sent a kite[5] about the incident addressed to Defendant Denwalt.

Seven days later, on the morning of September 10, 2017, Plaintiff was working in the kitchen as a cook when a dispute arose between him and Defendant Myers. Some of the exact events which precipitated that clash is disputed. Defendant Myers contends Plaintiff was making unauthorized meals,[6] refused to stop even though she ordered him to do so, and argued when he was asked to clean. Plaintiff, however, contends he only made meals authorized by BVCF personnel. Nonetheless, Plaintiff acknowledges he was out of his area (the grill where he was a

---

[2] Which, construing the facts in the light most favorable to Plaintiff, the Court assumes is true for the purposes of the motion.
[3] Correctional Officer.
[4] The housing for inmates is located in the East, Lower North, Upper North, and South Units. (ECF No. 63-9, 29:5-8.)
[5] A "kite" is an informal, but official, method of written communication between inmates and BVCF staff. (ECF No. 63-10, 27:7-11; ECF No. 66-2, 39:6-40:1.)
[6] The unauthorized meals apparently had to do with Plaintiff frying eggs when he was supposed to be scrambling them. (ECF No. 63-8, 13:20-16:7.)

cook) and was at the front line helping other employees stack cups. But Plaintiff contends this was because he had already finished his work and had cleaned his area. Plaintiff also acknowledges Defendant Myers told him to go back to his area and clean, but asserts he did go to back to his area and straightened a few things and only then did he return to straightening cups in the front line.[7] Defendant Myers then asked Plaintiff to go with her to the office to have a discussion with her and Lt. Lindsey Peterson.

During the discussion, Plaintiff used the words "fucking bitch" or "fucking bitches," depending on whose version is credited. Plaintiff said he only called Defendant Myers a "fucking bitch," not Lt. Peterson. Plaintiff also made some statement about being treated like a slave.[8] In any event, Defendant Myers contacted kitchen security and had Plaintiff escorted out of the kitchen due to his actions of name calling.

Thereafter, on the same date, Defendant Myers prepared an Incident Report of the events. In the Incident Report, Defendant Myers stated Plaintiff was to be terminated from the kitchen. And, Plaintiff was in fact terminated effective that date, September 10, 2017. The Incident Report stated Plaintiff was terminated for "disobeying a lawful order" or "DLO."[9] Plaintiff disputes the events as reported by Defendant Myers.

On Friday, September 15, 2017, Defendant Goodwin, Plaintiff's case manager, initiated a recommended reclassification of Plaintiff to Close Custody due to "refusal to work." Defendant Goodwin testified she initiated this on her own based on BVCF policy but Defendant Denwalt, Defendant Goodwin's supervisor, testified the initiation was done at his request and Defendant

---

[7] ECF No. 65-9, 79:18-80:21.
[8] ECF No. 65-9, 80:20-81:11.
[9] ECF No. 63-7.

Goodwin's discovery responses said that she prepared the reclassification "per the directives from" Defendant Denwalt.[10, 11] Regardless, Defendants Denwalt and Goodwin decided to treat the September 10, 2017 incident as a refusal to work instead of a DLO. Defendants Goodwin and Denwalt were aware that, if they changed the September 10, 2017 incident type from a DLO to "refusal to work," Plaintiff would be reclassified and could be transferred to Close Custody without notice or a hearing.

Plaintiff was upset about his termination and about potentially going to Close Custody.[12] And, on Tuesday, September 19, 2017, as memorialized in Defendant Goodwin's incident report of that date, the following occurred:

> On Tuesday, September 19, 2017 I was speaking with offender Hill, Steven #157837 outside the East Unit Case Manager's offices. He was recently released from Food Service for Disobeying a Lawful Order. After he was terminated he expressed that he had issues with Sgt. Myers in the kitchen. Sgt Myers is the one who terminated him. Offender Hill was requesting forms to complain about staff members. I told him he would have to pursue this through the grievance process. He then said "you know Lamm? The Asian guy who was terminated for touching her? She did the same thing to me, but I didn't touch her back". It is my understanding that he was referring to an offender who was terminated for pinching Sgt Myers. It is also my understanding that Lamm accused Sgt Myers of horse playing with him in the kitchen. I believe that offender Hill was referring to Sgt Myers horse playing with him in the kitchen. End of report.[13]

Plaintiff recalls the first part of this report, i.e., the DLO, issues with Sgt. Myers and his termination, and a request for forms. He does not, however, recall the second part, i.e., the discussion regarding Lamm, references to touching, or what Sgt. Myers allegedly did to him.[14] Defendant Denwalt testified he has no recollection of the incident report, but Defendant

---

[10] ECF No. 66-2, 50:6-24, 129:22-130:10; No. 63-10, 60:11-61:9; No. 63-14, p. 3.
[11] Based on the Court's decision, Defendant Goodwin's exact role in initiating this request is immaterial.
[12] ECF No. 66-2, 92:7-93:1.
[13] ECF No. 63-11, p.1.
[14] ECF No. 63-9, 106:11-20, 108:16-109:9.

Goodwin testified she had called him about it and forwarded the report to him that day.[15]

The Classification Committee, which included Defendant Denwalt, met on a Thursday, which would have been either September 21 or 28[16] and, therefore, after the incident report. The reclassification was approved then but not finalized until there was a bed space in Lower North to move Plaintiff.[17] On October 4, 2017, Plaintiff's reclassification was noted as "approved" and put into the system.[18] That decision was signed off by the Classification Chair, a non-party to this action. Also on that date Plaintiff was moved to Lower North as a result of his reclassification.

There is no set amount of time an offender may stay in Close Custody. Most offenders are in Close Custody for 60 to 90 days unless they refuse to work an assigned job. There is no maximum amount of time that an offender might remain in Close Custody.

In Lower North, Plaintiff had more restrictions than when he was in the East Unit. Generally, an offender in medium custody may stay out of his cell for most of the day and has more freedoms and privileges than an offender in Close Custody. An offender in Close Custody may be afforded from four to six hours of out-of-cell time and three to six non-contact visits each month, each lasting two hours. And, after thirty days in Close Custody, an offender who exhibits appropriate behavior may have up to four, two-hour long contact visits per month. An offender may also receive exercise and yard (outdoor recreation time). But, in Plaintiff's case, because there were approximately four different lockdowns in Lower North, unrelated to any actions by Plaintiff, for a combined total of about 6 1/2 weeks Plaintiff was confined in his cell 24 hours a

---

[15] ECF No. 63-10, 48:4-13, 50:18-20; No. 63-18, 100:21-101:6; No. 66-2, 134:11-19.)
[16] By the Court's calculation, based on the testimony.
[17] ECF No. 63-10, 62:23-63:17.
[18] ECF No. 63-10, 62:23-63:17.

day except for being let out once every three days for a shower.[19] The lockdowns were caused by

a riot or riots which started about a week or two after Plaintiff was placed in the Lower North

Unit.[20] Thus, for that time period Plaintiff was not afforded the freedoms and privileges he

otherwise would have had in the Lower North Unit.

As for the living conditions themselves, while the cells are the same size, the bed in

Lower North was the standard 6 feet long size at BVCF. Plaintiff is 6'8" and had been given an

extended bed when he was in the East Unit. The lack of an extended bed coupled with extended

time in his cell due to the riots intensified his back problem and pain while he was in the Lower

North Unit.

Meanwhile, on October 5, 2017, the day after he was moved, Plaintiff filed a grievance

alleging he had been fired from his kitchen job and removed from general population in

retaliation for notifying "ranking C.O.s" of sexual advances by Sgt. Myers on September 3,

2017. As a remedy, Plaintiff sought to be reassigned to the kitchen with a different supervisor,

reinstated into the general population, and any derogatory matter to be expunged from his

permanent record.[21] Plaintiff's grievance was denied at Step 1[22] on "procedural grounds"; that it

contained "many inconsistencies."[23] The grievance was denied at Step 2 because the grievance

procedure "may not be used" for classification or facility placement.[24] The grievance was denied

again at Step 3, with no comments.

On December 22, 2017, Plaintiff had a reclassification review where his score put him in

---

[19] ECF No. 66-1, ¶ 19.
[20] ECF No. 63-9, 49:7-20.
[21] ECF No. 63-13, p. 1.
[22] The BVCF has a three step grievance process. (*See* ECF No. 63-13.)
[23] *Id.* at p. 2.
[24] *Id.* at p. 3.

"minimum restrictive custody." The internal classification committee, however, issued a discretionary override and classified Plaintiff as medium custody.[25] Accordingly, on December 23, 2017, Plaintiff was moved out of the Lower North Unit.[26] Plaintiff's lawsuit followed. As relevant here, the only claims at issue are Plaintiff's claim for retaliation against all Defendants and claim for violation of procedural due process against Defendants Denwalt and Goodwin. Defendants move for summary judgment as to all claims.

## III.    DISCUSSION

### A.  Retaliation

Plaintiff alleges Defendants retaliated against him for reporting Defendant Myers' alleged sexual misconduct in violation of the First Amendment by terminating his job in the kitchen, reclassifying him to Close Custody, and placing him in the Lower North Unit.

"[P]rison officials may not retaliate against or harass an inmate because of the inmate's exercise of his constitutional rights,…even where the action taken in retaliation would be otherwise permissible." *Peterson v. Shanks*, 149 F.3d 1140, 1144 (10th Cir. 1998) (quotation marks and citation omitted). To establish a claim for government retaliation for exercising Plaintiff's First Amendment rights, there must be a showing:

> (1) that the plaintiff was engaged in constitutionally protected activity; (2) that the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct.

*Shero v. City of Grove, Okl.*, 510 F.3d 1196, 1203 (10th Cir. 2007). To establish the third

---

[25] ECF No. 66-2, 140:13-15.
[26] ECF No. 66-2, 138:4-8.

factor, an inmate must show that "'but for the retaliatory motive, the incidents to which

he refers ... would not have taken place.'" *Banks v. Katzenmeyer*, 645 F. App'x 770, 772

(10th Cir. 2016) (quoting *Peterson*, 149 F.3d at 1144). *See also Guy v. Lampert*, 748 F.

App'x 178, 180 (10th Cir. 2018) (same).

### 1. Protected Activity

For the purposes of the Motion, Defendants concede that Plaintiff engaged in

constitutional protected activity on September 19, 2017, when he spoke with Defendant

Goodwin about inappropriate physical contact by Defendant Myers. Defendants contend,

however, there is no "direct evidence" that Plaintiff wrote to or otherwise informed anyone about

the alleged sexual misconduct prior to his termination on September 10, 2017. Plaintiff,

however, contends there is such evidence – Plaintiff's own testimony. The Court agrees.

Here, Plaintiff testified that on September 3, 2017, he told C.O. Cisneros and sent a kite

to Defendant Denwalt. That Defendant Denwalt does not recall receiving the kite does not mean

that it was not sent. That Defendant Denwalt does not have a record of it or Plaintiff does not

have a copy of it is also not fatal where BVCF has no requirement, procedure, practice, or policy

that any documentation be made or kept and Plaintiff has no practice of keeping a copy.[27]

Accordingly, for purposes of the Motion, accepting Plaintiff's version of the events as true, the

fact finder could find Plaintiff engaged in protected activity on September 3, 2017 by

complaining of Defendant Myers' alleged sexual misconduct[28] to C.O. Cisneros[29] and Defendant

---

[27] Nor is there any evidence Plaintiff was required to keep a copy.

[28] Whether Defendant Myers engaged in sexual misconduct is another matter. It suffices to say Plaintiff's testimony that Defendant Myers engaged in this conduct and Defendant Myers' denial is sufficient to create a genuine dispute of material fact.

[29] Defendants argue Plaintiff fails to present any evidence by C.O. Cisneros to "corroborate" his testimony. (ECF No. 72, p. 5.) Defendants fail to cite any support that such corroboration is needed on summary judgment, especially

Denwalt.

### 2. Adverse Action

Defendants also concede, for purposes of the Motion, that terminating Plaintiff from his job, reclassifying him, and moving him to a different housing unit "could" chill an inmate of ordinary firmness from continuing to report a correction officer's sexual misconduct. (ECF No. 62, p. 7.)

### 3. Retaliatory Motive

Defendants make no concessions here. Instead, they argue Plaintiff cannot establish Defendants' adverse actions were substantially motivated in response to Plaintiff's exercise of constitutionally protected activities. The Court examines this factor as to each Defendant.

#### a) Defendant Myers

Defendants contend there is no evidence that Defendant Myers was substantially motivated by Plaintiff's alleged reporting of her sexual misconduct because of the lack of evidence that she was aware of such alleged report. Defendants also contend there is no evidence that but for Defendant Myers' alleged retaliatory motive, Plaintiff's termination from employment and reclassification would not have occurred. Instead, Defendants assert, Plaintiff's evidence is self-serving and speculative. Plaintiff responds[30] by relying on circumstantial

---

where there is no evidence to dispute Plaintiff's testimony that he told C.O. Cisneros about the alleged September 3, 2017 sexual misconduct.

[30] In a supplemental filing, Plaintiff also asserts alleged evidence of Defendant Myers' misconduct in an unrelated matter (accepting cash payments from an inmate) further supports his case. Specifically, Plaintiff argues this evidence demonstrates Defendant Myers terminated Plaintiff's employment in the kitchen in September 2017 (resulting in his reclassification and transfer to Lower North) to avoid investigation by CDOC because she was already involved in a cash payments scheme beginning in June *2017*. Plaintiff's argument is not only speculative but also unsupportable. Even if the Court were to credit the supplement, it shows any alleged scheme began in June *2018*, after Plaintiff's termination from his job in the kitchen. *See* ECF No. 84-1, p. 7 ("Sgt. Myers stated this incident began approximately 1.5 years ago," where such statement was taken on December 4, 2019.).

evidence. Defendants challenge Plaintiff's reliance on circumstantial evidence and contends his evidence is insufficient to defeat summary judgment.

The Court starts first with the permissible evidence. Defendants' papers contain several references to "direct evidence" and the like, and the contention, implicit or explicit, that circumstantial evidence may not be used to support Plaintiff's claim. The Court finds otherwise. *See, e.g., Smith v. Maschner*, 899 F.2d 940, 949 (10th Cir. 1990) (finding circumstantial evidence sufficient to defeat summary judgment on inmate's retaliation claim); *Weatherall v. Scherbarth*, 208 F.3d 228, 2000 WL 223576, at *2 (10th Cir. 2000) (unpublished table decision) (stating prisoner failed to provide sufficient circumstantial proof of a retaliatory motive to defeat summary judgment). The question then is whether Plaintiff has presented sufficient evidence, direct or circumstantial, to create a genuine factual dispute for resolution by a jury.

First, as to C.O. Cisneros, the Court agrees there is no evidence, direct or circumstantial, that she told anyone or did anything with what Plaintiff allegedly reported. To find C.O. Cisneros must have told Defendant Myers or told someone else who then told Defendant Myers would require speculation and conjecture. And, speculation and conjecture are insufficient to create a factual dispute. *Peterson*, 149 F.3d at 1144 (allegations of retaliation based on mere speculation rather than evidence are insufficient); *Weatherall*, 2000 WL 223576, at *2 (speculation and conclusory allegations are insufficient to raise a genuine issue as to any material fact). This holds true also as to Plaintiff's testimony regarding his subjective perception that non-defendant staff members' nonverbal communication changed for the worse after he reported the misconduct or that Defendant Myers appeared "pissed."[31]

---

[31] ECF No. 63-9, 98:3-18.

Plaintiff's other circumstantial evidence fares no better. Plaintiff's termination closely followed the alleged sexual misconduct but temporal proximity, standing alone, is insufficient. *Weatherall*, 2000 WL 223576, at *2; *Dawson v. Audet*, 636 F. App'x 753, 758 (10th Cir. 2016) (citing *Trant v. Oklahoma*, 754 F.3d 1158, 1170 (10th Cir. 2014)). Temporal proximity in connection with Plaintiff's other evidence is also insufficient.

Plaintiff relies on his grievance concerning Defendant Myer's alleged sexual misconduct, his termination and reclassification but this was filed *after* he was terminated, reclassified, and moved to Lower North.[32] Plaintiff also relies on his request for video footage of the kitchen for September 3, 3017 which request was denied or otherwise not provided.[33] But, assuming Defendant Myers did engage in sexual misconduct on September 3, which the Court does here, Plaintiff fails to articulate how this supports Defendant Myers was aware of Plaintiff's alleged report to show retaliatory motive and the Court declines to fashion arguments on his behalf. *See Shero*, 510 F.3d at 1207 (refusing to consider argument where plaintiff failed to present reasoned argument on the point).

Plaintiff's argument that he did not refuse to work or disobey an order fares no better. As Defendants assert, by Plaintiff's own admission, Defendant Myers ordered Plaintiff to return to his designated work area but, after he had done so to clean, he nonetheless returned to stacking cups in the front line. Moreover, Plaintiff admitted he used profanities against Defendant Myers. Thus, the record supports the stated reason for termination of Plaintiff's employment: Defendant Myers' perception that Plaintiff was disobeying her order and engaging in insubordinate conduct.

---

[32] ECF No. 63-13.
[33] OSUMF at ¶ 59.

The Court is mindful that "it is not the role of the federal judiciary to scrutinize and interfere with the daily operations of a state prison, and our retaliation jurisprudence does not change this role." *Peterson*, 149 F.3d at 1144.

Finally, Plaintiff contends that Defendant Myers' incident report is contradicted by her testimony. During her deposition, Defendant Myers testified that Plaintiff didn't like to follow instructions; that Plaintiff was making fried eggs when he was supposed to be making scrambled eggs; and that Plaintiff was not where he was supposed to be.[34] While Defendant Myers' testimony discussed more about the fried eggs, her incident report relied on Plaintiff not being where he was supposed to be – in the grill area and cleaning – for termination. Plaintiff's testimony is consistent with Defendant Myers' report – that he left his work area and went to the front line, Defendant Myers told him to go back, he did so but then returned to the front line. Thus, the Court finds no inconsistency sufficient to create a triable issue of fact.[35]

In summary, Plaintiff has not met his burden of demonstrating a genuine factual dispute concerning whether, absent his reporting of Defendant Myers' alleged sexual misconduct, Defendant Myers would not have fired him from his employment in the kitchen.[36] Accordingly, summary judgment is granted in favor of Defendant Myers on this sole claim against her.

### b) Defendants Denwalt and Goodwin

Defendants assert there is insufficient evidence that Plaintiff sent the kite and that

---

[34] ECF No. 63-8, 13:11-15:3.

[35] Plaintiff also argues, for example, that Defendant Myers never previously filed an incident report on Plaintiff, and there was no further investigation into the incident report. Plaintiff fails, however, to discuss how such facts support a finding of retaliatory motive on the part of Defendant Myers, e.g., how this shows she knew about the alleged September 3 report of sexual misconduct.

[36] There is also no evidence that Defendant Myers was involved in Plaintiff's reclassification and move to Lower North.

Defendants Denwalt and Goodwin knew of Plaintiff's report. Further, Defendants contend

Plaintiff cannot point to any evidence showing Defendants Denwalt and Goodwin possessed any

sort of animus towards Plaintiff to suggest a retaliatory motive. Defendants also assert Defendant

Goodwin was not the decision-maker in Plaintiff's reclassification. Finally, Defendants contend

the decision to reclassify Plaintiff was made on September 15, 2017, four days before Plaintiff

reported any incident to Defendant Goodwin. The parties combine these two Defendants but the

Court finds a separate analysis is appropriate.

*__Defendant Denwalt.__* Plaintiff contends that, at a minimum, there is a genuine factual

dispute as to whether Defendant Denwalt received the September 3 kite. And, further, there is

evidence in the record to support that Defendant Denwalt also received the September 19, 2017

report from Defendant Goodwin. The Court agrees that Plaintiff has proffered sufficient

evidence to create, at a minimum, a factual issue of whether Defendant Denwalt received the

September 3 kite and September 19 report. Plaintiff testified he sent the kite and Defendant

Goodwin testified she sent the September 19 report to Defendant Denwalt.

Assuming that Defendant Denwalt knew about Plaintiff's grievance against Defendant

Myers, Plaintiff nonetheless fails to present evidence that Defendant Denwalt's conduct was

motivated by retaliatory animus for Plaintiff's complaints, especially since there is no evidence

that Defendant Denwalt was involved in Plaintiff's termination. Plaintiff's reliance on alleged

circumstantial evidence is unavailing. For example, Plaintiff seeks to infer that Defendant

Denwalt must have been retaliating against Plaintiff for his complaints against Defendant Myers

because Defendant Denwalt did not "investigate"[37] them or the September 10 incident report. Other than listing various events, Plaintiff fails to discuss how they lead to such an inference. Moreover, the Court finds such inference is not justified on this record, especially since there is no evidence of any relationship between the parties other than Defendant Denwalt "occasionally" ate lunch in the kitchen.

In contrast, in *Smith*, *supra*, the inmate alleged that prison officials retaliated against him because of his exercise of his right of access to the courts. The Tenth Circuit found the inmate presented sufficient circumstantial evidence to establish a triable issue on his retaliation claim where prison officials searched his briefcase twice when they took him to the courthouse but he had never had a second search under the circumstances before; when he refused the second search, prison officials would not let him take his briefcase to court and it was retrieved only when the court ordered the officials to do so; when he returned to prison after his court appearance he was immediately placed in segregation and charged with several disciplinary charges, including disobeying an order; he suffered a sizeable loss of good time credits despite having a prior good record; he was denied his law papers and books while in segregation; and he submitted two affidavits – one from an inmate that he (the inmate) was placed in segregation to prevent him from being a witness for plaintiff in a pending lawsuit and one from a prison law clerk that he was removed from his library employment in retaliation for assisting plaintiff while he was in segregation. *Smith*, 899 F.2d at 947-48. Such circumstantial evidence supported the inmate's claim of retaliation for the exercise of his right to access to the courts. The same could

---

[37] Plaintiff asserts no investigation was done but while Defendant Denwalt did not contact Defendant Myers about her incident report, he did review it to ensure the actions described were consistent with "refusal to work." (ECF No. 72-2, p. 2; No. 63-10, 62:5-16.)

not be said of the evidence Plaintiff submits here. Accordingly, summary judgment is granted in favor of Defendant Denwalt on this claim.

***Defendant Goodwin.*** Plaintiff contends that since Defendant Denwalt is Defendant Goodwin's supervisor and Defendant Goodwin was Plaintiff's case manager during the relevant time, Defendant Denwalt "likely" forwarded the September 3 kite to Defendant Goodwin. Thus, Plaintiff contends, Defendant Goodwin knew of Plaintiff's complaints against Defendant Myers and reclassified and moved him in retaliation for the complaint. The Court is not persuaded.

Plaintiff cannot create a factual dispute based on speculation of what may or may not have "likely" occurred. Thus, as to Defendant Goodwin, the Court finds the evidence could not lead a reasonable jury to find that she had knowledge or notice of the September 3 kite. And, even if Defendant Goodwin had a role in the reclassification of Plaintiff, she initiated that reclassification on September 15, four days before Plaintiff approached Defendant Goodwin about Defendant Myers' horse play. Finally, as with Defendant Denwalt, Plaintiff fails to present evidence that Defendant Goodwin's conduct was motivated by retaliatory animus, even assuming she was aware of Plaintiff's sexual misconduct complaints. There is no evidence that Defendant Denwalt was involved in Plaintiff's termination and, further, Defendant Myers testified that she did not even know if she's ever seen Defendant Goodwin.[38] Accordingly, summary judgment is granted in favor of Defendant Goodwin on this claim.

## B. Due Process

Plaintiff's remaining claim alleges Defendants Denwalt and Goodwin violated his

---

[38] ECF No. 63-8, 7:6-13.

Fourteenth Amendment[39] right to procedural due process when they changed his housing to Lower North.[40] "The Fourteenth Amendment's Due Process Clause protects persons against deprivations of life, liberty, or property; and those who seek to invoke its procedural protection must establish that one of these interests is at stake." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005). In considering a procedural-due-process claim, the Court asks two questions: "'(1) Did the plaintiff possess a protected property or liberty interest to which due process protections apply? And if so, (2) was the plaintiff afforded an appropriate level of process?'" *Al-Turki v. Tomsic*, 926 F.3d 610, 614 (10th Cir. 2019) (quoting *Martin Marietta Materials, Inc. v. Kansas Dep't of Transp.*, 810 F.3d 1161, 1172 (10th Cir. 2016)).

Plaintiff asserts he has a cognizable liberty interest to which due process protection applies. "A liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word 'liberty,'…or it may arise from an expectation or interest created by state laws or policies." *Id*. "State policies or regulations will not create the basis for a liberty interest in the conditions of confinement so long as they do not 'impose[ ] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'" *Estate of DiMarco v. Wyoming Dep't of Corr.*, 473 F.3d 1334, 1339 (10th Cir. 2007) (brackets in original) (quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995)).

When determining whether a placement decision involves an atypical and significant hardship, factors which the Court might consider include: (1) whether the segregation (or, here, placement) furthers a legitimate penological interest; (2) whether the conditions of the placement

---

[39] Plaintiff cites to the Fifth Amendment in his brief (ECF No. 66, p. 15). That matters not because "[c]ourt interpretations of one due-process clause generally apply to the other." *Al-Turki v. Tomsic*, 926 F.3d 610, 614 (10th Cir. 2019).

[40] ECF No. 66, p. 15. Plaintiff does not assert a liberty interest in his job assignment or classification.

are extreme; (3) whether the placement increases the duration of confinement; and (4) whether the placement is indeterminate. *See Estate of DiMarco*, 473 F.3d at 1342. This "assessment must be mindful of the primary management role of prison officials who should be free from second-guessing or micro-management from the federal courts." *Id.* In this case, these factors cut against finding the existence of a liberty interest.

      ***Legitimate Penological Interest.*** Defendants contend Plaintiff was not segregated and the CDOC's interest in the safe and orderly administration of a correctional facility motivated Plaintiff's reclassification and resulting change in housing. Plaintiff counters that Defendants' actions show they did not view Plaintiff as a safety and security threat because between the time Plaintiff's reclassification was initiated (September 15) and the time it was finalized (October 4), Plaintiff was not assigned to a special unit for offenders who were an alleged threat to safety, he was not assigned extra security, he was allowed to walk the hallways as normal, and he spoke with Defendant Goodwin one-on-one in the hallway. Defendants fail to address what appears to be an inconsistency, instead reiterating that Plaintiff disobeyed Defendant Myers' instruction and was verbally abusive toward her, such that he could become a physical threat or otherwise misbehave. But, even if that were so, Defendants fail to offer evidence or an explanation of why Plaintiff was free to go about the BVCF as he also did during the more than two weeks when he was allegedly a threat. Accordingly, the Court finds Plaintiff has presented sufficient evidence to create a jury question of whether the placement of Plaintiff in Lower North furthered a legitimate penological interest. As such, this factor could weigh in favor of Plaintiff and the Court does so for the purposes of the Motion.

      ***Conditions of Confinement.*** Plaintiff does not dispute that an offender in Close Custody

may be afforded four to six hours of out-of-cell time; three to six non-contact visits each month, lasting two hours; up to four, two-hour long contact visits per month, after 30 days in Close Custody, if an offender who exhibits appropriate behavior[41]; and exercise and yard (outdoor recreation) time. Plaintiff contends, however, that such conditions did not exist for about 6 ½ weeks while he was in Close Custody because the unit was in lockdowns for riots unrelated to Plaintiff. Moreover, the beds at BVCF are 6' and Plaintiff is 6'8"; he was not given an extended bed in Close Custody to accommodate his height when he had been given an extended bed while housed in the East Unit. This, coupled with Plaintiff's confinement to this cell, intensified his back pain. While Plaintiff sent a kite requesting to see the medical department, he was unable to do so due to the lockdowns. Defendants contend that, even if Plaintiff's testimony is credited, it is not extreme. The Court agrees.

As Defendants argue, there is no evidence that lockdowns were typical or that Defendants could have expected they would occur while Plaintiff was housed in the Lower North. While Plaintiff was not allowed what he otherwise would have been allowed but for the lockdowns, the Court finds the conditions to be examined are what Plaintiff would have been allowed, *see generally Rezaq v. Nalley*, 677 F.3d 1001, 1005, 1015 (10th Cir. 2012) (record showed BOP policy provided for ten hours of recreation per week but recreation was frequently cancelled due to staff shortages, mass shakedowns, or adverse weather; nonetheless, the Tenth Circuit considered whether inmates were permitted outdoor recreation), especially where there is no evidence that the lockdown conditions were anticipated, typical, or otherwise the norm.

---

[41] Subject to a maximum of six total visits (contact and non-contact) per month. (ECF No. 72-1, SUMF & OSUMF at ¶ 48.)

Plaintiff's only other complaint relates to the size of his bed and the resulting intensified pain while he was in Lower North.[42] While CDOC could have provided a better accommodation, i.e., an extended bed, the Court does not find that restricting Plaintiff to a 6' standard bed imposed atypical and significant hardships on him in relation to the ordinary incidents of prison life. Thus, this factor weighs against finding a liberty interest.

*Duration of Confinement.* Plaintiff's confinement in Lower North did not result in the reduction of his good time or earned time credits. Moreover, Plaintiff has no evidence that his confinement would impact any future parole hearing. Thus, this factor also weighs against finding a liberty interest.

*Indefiniteness of Confinement.* "In analyzing whether the placement is indeterminate the court consider[s] placement duration and frequency of placement review." *Marshall v. Ormand*, 572 F. App'x 659, 662 (10th Cir. 2014) (citing *Estate of DiMarco*, 473 F.3d at 1342). Plaintiff's placement in Lower North was not for a predetermined length of time. There is no set review period, but there are events which would trigger a review. Typically, an offender would be unassigned for 30 days, then assigned a job for 30 days, and then reviewed to be removed from Close Custody. Most offenders are in Close Custody for 60-90 days, unless they refused to work; there is, however, no maximum amount of time that an offender might remain there.[43] In this case, Plaintiff remained in Close Custody for less than three months. Upon his review in December 2017, Plaintiff was moved out of Lower North. On this record, the Court finds Plaintiff's confinement was not indefinite. *See Rezaq*, 677 F.3d at 1016 ("The availability of

---

[42] Plaintiff apparently suffered no lasting effects. (ECF No. 63-9, 70:7-13.)
[43] ECF No. 63-10, 36:10-37:8, 38:2-10.

periodic reviews…suggests that the confinement was not indefinite.").

In summary, none of the factors are dispositive. *Estate of DiMarco*, 473 F.3d at 1342.

Weighed together, the Court finds the factors as applied to the undisputed material facts do not

show Plaintiff's confinement in Close Custody creates a protected liberty interest. While living

in Close Custody was more restrictive (even in the absence of the lockdowns) with one lesser

amenity (the bed), the Court cannot say the difference is so extreme as to be atypical or

significant. Accordingly, summary judgment is granted to Defendants Denwalt and Goodwin on

this claim.

### C. Qualified Immunity

Qualified immunity shields individual defendants named in § 1983 actions unless their

conduct was unreasonable in light of clearly established law. *Estate of Booker v. Gomez*, 745

F.3d 405, 411 (10th Cir. 2014). "[W]hen a defendant asserts qualified immunity, the plaintiff

carries a two-part burden to show: (1) that the defendant's actions violated a federal

constitutional or statutory right, and, if so, (2) that the right was clearly established at the time of

the defendant's unlawful conduct." *Id*. (quotation omitted). The district court may address the

steps in either order. *Carabajal v. City of Cheyenne, Wy.*, 847 F3d 1203, 1208 (10th Cir. 2017)

(citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)). If the plaintiff fails to satisfy either part

of his burden, the court must grant qualified immunity. *Id*.

As stated above, Plaintiff fails to show Defendants violated his constitutional rights.

Accordingly, Defendants are entitled to qualified immunity on all claims.

### IV.  CONCLUSION

Based on the foregoing, it is **ORDERED**

(1)  That Defendants' Motion for Summary Judgment (ECF No. 62) is GRANTED;

(2)  That Plaintiff shall file a redacted copy of ECF No. 84-1, p. 7 for public access.[44] The

page shall be redacted of everything *except* for (a) the heading showing it is an

investigative report from the CDOC's Office of Inspector General; (b) the first

paragraph (but the investigator's name may be redacted)[45]; and (c) the first two

sentences of the fifth full paragraph[46];

(3)  That the Clerk shall enter JUDGMENT in favor of Defendants and against Plaintiff in

accordance with this Order and the Order of May 23, 2018 (ECF No. 10); and

(4)  That the Clerk shall close this case.

DATED this 5th day of June, 2020.

BY THE COURT:

_____

RAYMOND P. MOORE
United States District Judge

---

[44] Plaintiff shall link this filing with ECF No. 84.
[45] Starts with "On Wednesday…."
[46] Starts with "I asked Sgt. Meyers…."